**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| MOTOFIT, LLC d/b/a MOTOFIT,<br><br>       Plaintiff,<br><br>v.<br><br>DUCATI NORTH AMERICA, INC.<br><br>       Defendant. | CIVIL ACTION NO.<br><br><br><br><br><br><br><br><br><br>JUNE 13, 2019 |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, MOTOFIT, LLC d/b/a MOTOFIT ("MotoFIT") as and for its Complaint against Defendant, DUCATI NORTH AMERICA, INC., ("DNA"), asserts and alleges as follows:

**The Parties**

1. Plaintiff, MotoFIT is a Connecticut limited liability company with its principal place of business located at 10 Mill Plain Road, Danbury, Connecticut 06811.

2. MotoFIT, a "Dealer" as defined in C.G.S. §42-133r(6), operates a Ducati-brand motorcycle dealership pursuant to a "Franchise," as defined in C.G.S. §42-133r(10), granted by DNA. Motorcycles are "motor vehicle[s]" as that term is defined in C.G.S. §42-133r(7). MotoFIT maintains a license with the Department of Motor Vehicles to engage in this activity. Dealers are also sometimes referred to as franchisees.

3. Defendant, DNA, a California corporation, located at 448 East Middlefield Road, Mountain View, California 94043, serves as the marketing and distribution subsidiary of Ducati Motor Holding S.p.A. of Italy. DNA markets, wholesales, and services Ducati motorcycles, parts

and accessories and franchises Ducati motorcycle dealerships in the United States. DNA is a "Distributor" as defined in C.G.S. §42-133r(2). Distributors are also referred to as franchisors.

## Jurisdiction

4. This court has jurisdiction pursuant to 28 U.S.C. 1332(a)(1) in that there is complete diversity of citizenship and, because it concerns a valuable motorcycle franchise, the amount in controversy exceeds the sum of $75,000.00 exclusive of attorneys' fees and costs.

5. Venue is proper in this district pursuant to 28 U.S.C. 1391(a) in that jurisdiction is founded solely on the basis of diversity, and DNA, by virtue of its systematic and continuous business contacts in this district, resides in this district and/or many of the acts and transactions giving rise to this action occurred in this district.

## General Allegations

6. MotoFIT operates under a Ducati North America, Inc. Authorized Dealer Agreement with DNA for the Ducati line-make ("Dealer Agreement"). Incorporated by reference into the Dealer Agreement are Ducati North America, Inc. – Dealer Operating Standards as well as Ducati's Retail Sales Policy Statement dated April 29, 2014, effective May 1, 2014, that also governs the franchise relationship. The Dealer Agreement and corresponding Dealer Operating Standards and Retail Sales Policy are attached hereto as "Exhibit A." The Dealer Agreement authorizes MotoFIT to sell new Ducati products and perform authorized warranty and service work on Ducati cycles.

7. The Dealer Agreement became effective October 10, 2011, and has been in full force and effect at all relevant times hereto.

8. DNA drafted the Dealer Agreement in its entirety. DNA does not entertain any negotiation with dealers over the terms and conditions set forth in the Dealer Agreement. MotoFIT

has no meaningful bargaining power with DNA. The Dealer Agreement is a contract of adhesion, offered on a "take-it-or-leave-it" basis. From time to time, DNA unilaterally issues provisions that purport to amend the Dealer Agreement, including, but not limited to, changes to the Dealer Operating Standards and Retail Sales Policy.

9. Since opening the Ducati franchise in 2011, MotoFIT has endeavored to vigorously and aggressively promote and sell Ducati products. But, as in all franchisor-franchisee business relationships, there are differing goals that each business seeks to maximize and these differing goals create tension and sometimes disputes between the businesses.

10. Distributors, like DNA, consistently seek to maximize their distribution and sale of products to their franchisees. And, while franchisees, like MototFIT, want to sell as much product as they can, they must consider their costs in doing so, especially relative to the demand for products in their markets. In short, distributors have a captive customer base that is contractually obligated to purchase and sell their products, no matter the price or demand, while dealers must balance consumer demand and inventory expense against the vast amount of a product a distributor would otherwise seek to unload on them. In simple economic terms, distributors are unconcerned if a vast supply of motorcycles depresses the price for those vehicles to consumers because they have a captive group of purchasers, the dealers. Whereas dealers must consider the supply of motorcycles they place into the stream of commerce or risk devaluing the products, lowering their sales prices, and depressing their profits.

11. This push and pull in the economic relationship between franchisors and franchisees has and will always exist, but it creates inequities and potential areas for abuse, especially when a franchisor unilaterally sets the terms of franchise agreements, determines the price it charges for products in its sole discretion, and has significant leverage to shift additional

costs, obligations, and duties onto its franchisees. Mindful of these inequities and differences in scale and leverage, both the United States Legislature as well as the Connecticut General Assembly have enacted remedial statutes to balance the unequal bargaining power that exists in the franchisor-franchisee relationship. These statutes seek to protect franchisees or dealers from unfair termination of their franchise agreements, retaliatory conduct and coercive practices by franchisors or distributors. The potential for harm in this area is especially acute because of the extremely concentrated market in which franchisees operate.

12. The reasoning for these statutes was succinctly explained and endorsed by the United States Supreme Court in *New Motor Vehicle Board v. Orrin W. Fox Co*. Justice Brennan explained that:

> Dealers are with few exceptions completely dependent on the manufacturer for their supply of cars. When the dealer has invested to the extent required to secure a franchise, he becomes in a real sense the economic captive of his manufacturer. The substantial investment of his own personal funds by the dealer in the business, the inability to convert easily the facility to other uses, the dependence upon a single manufacturer for supply of automobiles, and the difficulty in obtaining a franchise from another manufacturer all contribute toward making the dealer an easy prey for domination by the factory. On the other hand, from the standpoint of the automobile manufacturer, any single dealer is expendable. The faults of the factory-dealer system are directly attributable to the superior market position of the manufacturer.

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*, 439 U.S. 96, 100 n. 4 (1978) (*quoting* S. Rep. No. 2073, 84th Cong., 2d Sess., 2 (1956)).

13. Over thirty years ago, the Connecticut General Assembly, like Congress and legislatures in other states, saw fit to regulate the distributor/dealer relationship, and enacted §§42-133r-ee (the "Dealer Franchise Act"). The Dealer Franchise Act reflects Connecticut's similar understanding to that enunciated in *Orrin Fox* and governs, among other things, termination by

distributors, forced ordering of products as well as other coercive practices and prohibited illegal actions by distributors against dealers.

14. The current matter is a perfect example of why legislatures throughout the United States enacted such statutes and why their necessity remains to this day.

### MotoFIT's Increasingly Contentious Relationship with DNA

15. As mentioned *supra*, MotoFIT became a Ducati-brand dealer in October 2011. The relationship was mutually-beneficial in the beginning, but has devolved over time. Each geographic area of dealers is assigned a Regional Business Manager by DNA. This Regional Business Manager is the main point of contact between dealers in a region and DNA. For a number of years, MotoFIT's Regional Business Manager was Jason Routhier. Mr. Routhier and MotoFIT have always had a hot and cold relationship, at least partially based on the inherent economic push and pull that exists in the franchisor-franchisee relationship. However, over time, Mr. Routhier developed significant animosity and spite towards MotoFIT. This viewpoint became clearer recently and was all but confirmed with DNA's bogus Termination Notice, discussed in more detail *infra*.

16. Mr. Routhier has long favored two dealers in MotoFIT's geographic area Hudson Valley Motorcycles in Hudson Valley, New York and Ducati New York in New York, New York. Mr. Routhier's favoritism towards these dealers has been to the detriment of MotoFIT. In fact, when Mr. Routhier was promoted to a new role, Commercial Manager Eastern U.S., in January 2016, he retained responsibility over two dealers in the region, Hudson Valley Motorcycles and Ducati New York, an unusual arrangement considering he was promoted to oversee Regional Business Managers that usually have responsibility for individual dealerships.

17.     From his position of increased power, Mr. Routhier continued to act out of spite towards MotoFIT. MotoFIT began exploring a sale of its dealership to Hudson Valley Motorcycles in September 2015, a fact DNA and Mr. Routhier were aware of. As an alternative to the sale, MotoFIT was also in discussions with DNA and a respected local motorcycle service shop named European Cycle Services ("ECS"). A partnership with ECS would have brought in additional revenue and alleviated some costs for MotoFIT, obviating the necessity to explore a sale of the dealership. These discussions continued for most of 2016.

18.     Ultimately in December 2016 and January 2017, Mr. Routhier indicated that DNA would not allow MotoFIT to outsource its service work to ECS. On March 1, 2017, Mr. Routhier forwarded MotoFIT a marketing announcement regarding Hudson Valley Motorcycles entering a strategic partnership with ECS. Upon information and belief, Mr. Routhier, on behalf of DNA, forbid MotoFIT from exploring this partnership, so he could propose it to his favored dealer, Hudson Valley Motorcycles, instead.

19.     Thereafter, talks between MotoFIT and Hudson Valley Motorcycles regarding a sale of MotoFIT picked up, and the parties began negotiating a letter of intent and exploring obtaining the necessary approvals from DNA to exchange information related to the potential sale. In October 2017, the parties were close to reaching agreement on a letter of intent.

20.     DNA reached out in November 2017 asking MotoFIT to provide official notification of its intent to sell the franchise and MototFIT advised DNA that Hudson Valley Motorcycles was still working through a few items on their end, so MotoFIT would have to hold off on providing official notification to DNA of the impending sale.

21.     Then, when MotoFIT followed up with Hudson Valley Motorcycles in early January 2018 regarding finalizing the sale and purchase of MotoFIT, Hudson Valley Motorcycles,

out of the blue, informed MotoFIT it was no longer interested in purchasing MotoFIT. Hudson Valley Motorcycles provided almost no explanation to MotoFIT regarding its sudden about-face, but did mention that it had some issues with DNA that it would rather not discuss with MotoFIT.

22. Concurrently, DNA and MotoFIT were engaged in a dispute regarding MotoFIT's allegedly unacceptably small orders of motorcycles from DNA.[1] Upon information and belief, DNA instructed Hudson Valley Motorcycles to hold off on the purchase of MotoFIT because DNA's actions and retaliatory conduct against MotoFIT were likely going to put it out of business or cause it to be devalued significantly. Thus, Hudson Valley Motorcycles could get the territory for basically free, rather than purchasing MotoFIT.

### DNA's Retaliatory Conduct and Attempt to "Choke-Off" MotoFIT

23. In November 2017, DNA contacted MotoFIT about placing an order for new 2018 motorcycles. MotoFIT decided that it would order approximately 35 motorcycles to restock its inventory.

24. When MotoFIT informed DNA of its desire to make a qualifying purchase of 35 motorcycles, its then Regional Business Manager, Robert Boyer approved the order and agreed it made sense for the dealership while he was visiting the MotoFIT dealership. Mr. Routhier, Robert Boyer's boss, noted that this small order would not make DNA happy. Mr. Routhier reached out to MotoFIT and insisted that MotoFIT order at least 44 motorcycles or it would get none. Mr. O'Mahony refused.

25. Thereafter, DNA, and Mr. Routhier specifically, instead pressured another MotoFIT employee to place the order for 44 motorcycles. Under duress, this MotoFIT employee did so. When Mr. O'Mahony learned of this, he contacted DNA and expressed his displeasure

---

[1] Notably, Connecticut law forbids minimum order amounts from franchisors, so there is no legal or legitimate basis for DNA to argue that MotoFIT's orders were unacceptably small. *See* C.G.S.A. § 42-133bb(1) and § 42-133v(f)(4).

that they had gone behind his back and forced another employee, who had no authority to order inventory, to do what he had specifically told DNA he would not do.  After significant back and forth, DNA finally agreed to cancel the order, as DNA was required to do anyway pursuant to Connecticut law.  *See* C.G.S.A. § 42-133bb(1).  However, following this fiasco, Mr. Routhier made clear that "DNA would not forget MotoFIT's actions" in this situation, as well as what he considered to be unacceptable levels of inventory orders from MotoFIT.  Apparently, Mr. Routhier was foreshadowing the current troubles DNA is now causing for MotoFIT.

26. This was not the first issue MotoFIT had experienced with DNA regarding it being forced to accept product it had not ordered.  In August 2016, another motorcycle was delivered that MotoFIT had not ordered and it took over a year and half of back and forth between MotoFIT and DNA for DNA to finally accept MotoFIT's return of the motorcycle, as it was required to under Connecticut law.  DNA knew that previous large orders, at DNA's urging, had taxed MotoFIT with an unreasonably high-level of interest expense, but continued to tell MotoFIT that it was not ordering enough product from DNA and that its small orders had been a "slap in the face" to DNA.  All of this despite Connecticut General Statute section 42-133bb(1) forbidding a manufacturer from forcing a dealer to order more inventory that it voluntarily wants.

27. In addition to DNA's attempts to force MotoFIT to order product it did not want, it also attempted to choke-off MotoFIT from getting motorcycles in other ways widely-utilized by other Ducati dealers.

28. In September 2017, MotoFIT was exploring transfers of products with other willing Ducati dealers as way to refresh inventory at both stores.  DNA usually encourages this sort of activity and does little to regulate it.  However, in this instance, DNA's regional representatives

encouraged other dealers not to participate in transfers of product with MotoFIT. Upon information and belief, DNA has not done this to any other Ducati-brand dealer.

29. Then, in March and April 2019, after MotoFIT did not order any new Ducati product for the first quarter of 2019, which DNA expressed extreme displeasure over, MotoFIT again tried to complete a dealer to dealer transfer of product to refresh its inventory. And, again, MotoFIT's regional representative obstructed MotoFIT from completing these transfers. The dealer on the other end of the transfer told MotoFIT that it had been a Ducati-brand dealer for 13 years and had never known DNA to actively encourage a dealer not participate in a proposed transfer of product or require DNA's approval before a dealer could transfer motorcycles to another dealer.

30. At the time, another Ducati dealer was instructed by DNA to begin advertising in MotoFIT's market area "because they won't be around much longer." And, the same dealer also noted that Hudson Valley Motorcycles had been very interested in buying MotoFIT. Upon information and belief, Hudson Valley held off when DNA intimated that it would devalue MotoFIT through its retaliatory conduct and MotoFIT could then be purchased more cheaply or the territory would be completely free, if MotoFIT was terminated.

### DNA's Bad Faith and Deficient Notice of Termination

31. As MotoFIT's relationship with DNA deteriorated and DNA continued to try to slowly snuff out MotoFIT's business, DNA was looking for a pretextual basis to end its relationship with MotoFIT.

32. On March 19, 2019, DNA issued MotoFIT a Notice of Requirement to Cure and Intent to Terminate Ducati North America, Inc. Dealer Agreement (the "Notice"). A copy of the Notice is attached hereto as Exhibit B.

33. Therein, DNA laid outs its pretextual basis to end its contractual relationship with MotoFIT. None of the alleged violations therein rise to the level of good cause and good faith required by Connecticut law.

34. Section I explains the *single* instance that DNA claims underlies its ability to terminate MotoFIT under four different, allegedly-material provisions of the Dealer Agreement.

35. In November 2018, a customer contacted MotoFIT interested in purchasing a 2018 V4 Speciale Ducati motorcycle. The customer lived in Dallas, Texas, but had found this particular motorcycle on the internet.[2] MotoFIT and the customer reached an agreement on the sale of the motorcycle, but the customer needed it delivered to his home in Texas.

36. This situation presented unique circumstances for MotoFIT because its Dealer Agreement and the attendant policies require that it effectuate delivery and transfer of the motorcycle, including attendant inspections, at its dealership premises.

37. Knowing the importance of these requirements, MotoFIT reached out to DNA and made them aware of the potential transaction. Mr. Routhier told MotoFIT to sell the motorcycle however possible because the new models were coming out soon.

38. Mr. Routhier had suggested the eBay advertisement and also told MotoFIT to "white glove ship it," if necessary. "White glove shipping" a motorcycle was Mr. Routhier's term for consummating a transaction with a customer through a shipment with delivery at a location other than the dealership premises. He used this term to describe a transaction that while technically not allowed under the Dealer Agreement he still viewed as acceptable.

---

[2] MotoFIT has a website that displays its products. But, at this time, Mr. Routhier had instructed DNA to sell its remaining last year's inventory in any manner it could, including explicitly telling DNA to advertise the motorcycle on eBay.

39. Mr. Routhier continued to actively communicate with MotoFIT about the consummation of this transaction and had complete knowledge of it, including that it required delivery to a customer in Texas. The sale was completed in or about January 2019 with Mr. Routhier's continued guidance and complete knowledge.

40. Thereafter, DNA sent MotoFIT the Notice alleging that the very transaction that its employees had provided MotoFIT guidance on completing was actually a violation of the Dealer Agreement and grounds for termination. Brazenly, DNA's employees never counseled MotoFIT that following through with the transaction, even "white glove shipping it" as Mr. Routhier had suggested, would, in DNA's view, still constitute grounds for termination.

41. These actions by DNA clearly evidence bad faith and moreover do not even constitute a terminable offense under DNA's own policies, further belying DNA's bad faith intent. Moreover, upon information and belief, DNA has allowed previous transactions consummated similarly to this one to go unpunished, despite its knowledge thereof.

42. DNA's first alleged basis for termination involves a breach of two provisions of the Dealer Agreement, one of which simply makes violations of the DNA's unilaterally-promulgated Retail Sales Policy violations of the actual Dealer Agreement.

43. Paragraph 5.06 requires MotoFIT to comply with "future directives, bulletins and manuals pertaining to the sale and servicing of [Ducati] Products." And, the correspondingly-cited bullet points of the Retail Sales Policy were allegedly violated when MotoFIT consummated the sale in the manner in which DNA counseled it.

44. Bullet Point 5 of the Retail Sales Policy requires that all "pre-delivery assembly, inspection, preparation and service obligations" including delivery of the motorcycle to the customer be performed at the "authorized dealership location" and paperwork relating thereto be

completed and retained by the dealer. And, DNA also cites Bullet Point 8, which unilaterally declares any sales in violation of the Retail Sales Policy to be a material and substantial breach of the Dealer Agreement.

45. MotoFIT does not dispute that all of these tasks were not performed at its authorized location, but they were still completed at an alternative authorized location (of another DNA dealer) with DNA's full knowledge. Moreover, none of the obligations were not performed, nor was the paperwork not completed.

46. DNA goes on to cite Paragraph 7.03 of the Dealer Agreement requiring the dealer to "perform inspection, set-up, preparation and delivery obligations as prescribed by Ducati from time to time" as the other provision supporting its first basis for termination. Between MotoFIT and the DNA dealer in Fort Worth, Texas, there is no disputing that all of these items were completed.

47. Thus, DNA's entire first alleged basis for termination, citing four total policies, essentially boils down to MotoFIT's failure to do all of the required activities at its authorized dealership location – there is no disputing, though, that all of the obligations were performed. Objectively, such an alleged violation is clearly not a material or substantial breach of DNA's Dealer Agreement, no matter what DNA determines in its unilateral and abusive discretion.

48. Next, DNA alleges that MotoFIT violated Paragraph 4.01 of the Dealer Agreement by operating a dealership at a location other than its authorized dealership premises. This claim is even less plausible, considering that the transaction was negotiated and consummated at MotoFIT's authorized location, and only the delivery and attendant inspections occurred at another location. MotoFIT has no continuous operations, sales or deliveries of vehicles at any other location than its authorized dealership premises, save for this one exceptional sale.

49.     Continuing to add on frivolous alleged violations, DNA confusingly alleges that MotoFIT violated Paragraph 11.03(e) of the Dealer Agreement.  That paragraph and subsection simply note that DNA is required by its own Dealer Agreement to provide MotoFIT with at least thirty days' notice of its intent to terminate the Dealer Agreement when an alleged substantial breach of a material obligation of the Dealer Agreement occurs.  How MotoFIT "violated" this paragraph of the Dealer Agreement is, at a minimum, puzzling.

50.     Finally, DNA continues its wanton stacking of alleged "violations" by arguing that MotoFIT violated Paragraph 11.02(e) of the Dealer Agreement by "chang[ing] the location of the Dealer's business or establish[ing] [an] additional premises" for the Dealer's motorcycle operations.  Does DNA actually expect an objective observer to agree that by delivering a single motorcycle at another Ducati's dealer's dealership premises, as Mr. Routhier counseled it to do, MotoFIT established an additional premises or changed the location of its operations?  There is simply no factual basis to support this alleged violation.

51.     In reality, the Notice evidences DNA's disdain for MotoFIT and its desire to go to any lengths to terminate MotoFIT's operations, no matter the absurdity of the pretextual basis.

52.     Fortunately for MotoFIT, Connecticut law requires that DNA do much more than entrap MotoFIT in a pretextual alleged violation of the Dealer Agreement to effectuate a termination.  As authorized by C.G.S. §42-133ee, MotoFIT has filed this action because the proposed termination lacks the requisite good cause, and because DNA has not acted in good faith.  As a result, the termination is prohibited under C.G.S. §42-133v and other Connecticut laws.

**Legal Standard for Terminating a Dealer**

53.     In order to terminate a franchise with a licensed dealer, a distributor must satisfy the notice requirements in §42-133v(d) and establish that it "has ***good cause*** for cancellation, termination or nonrenewal and has acted in ***good faith***." C.G.S.A. §42-133v(a) (emphasis added).

54.     C.G.S.A. §42-133v(b) relates that:

> Notwithstanding the terms, provisions or conditions of any franchise or the terms or provisions of any waiver or other agreement between the manufacturer or distributor and the dealer, good cause exists for the purposes of a termination, cancellation or nonrenewal if:
> (1) There is a failure by the dealer to comply with a provision of the franchise which is ***both reasonable and of material significance*** to the franchise relationship, provided that the dealer has been notified in writing of the failure not later than one hundred eighty days after the manufacturer or distributor first acquired knowledge of such failure…(emphasis added)

55.     DNA has the burden of proof pursuant to C.G.S.A. §42-133v(c).

56.     Moreover, C.G.S.A. §42-133v(f)(4) also prevents DNA from terminating MotoFIT for refusing "to meet unreasonable minimum standards and marketing guides, which include, but are not limited to…inventory." Accordingly, DNA has created this trumped-up Notice to avoid its real reason for desiring to terminate MotoFIT – MotoFIT's refusal to accede to DNA's unlawful demands to order more motorcycles.

57.     The protections contained in the Dealer Franchise Act are remedial. *See Edmonds v. Cuno, Inc.*, 277 Conn. 425, 441, n.10 (2006) (the Franchise Act is remedial and serves to "prevent a franchisor from unfairly exerting economic leverage over a franchisee."); *Hartford Electric Supply Co. v. Allen-Bradley Co.*, 250 Conn. 334, 350 (1999) (Franchise Act's purpose is to prevent a franchisor from unfairly exerting economic leverage of a franchisee); *Getty Petroleum Marketing, Inc. v. Ahmad*, 253 Conn. 806, 819 (2000) (Franchise Act's purpose is "to protect

independent business persons who have assumed an entrepreneurial role and who face the risk of the market").

58. Pursuant to C.G.S.A. §42-133v(g), a dealer may bring action to challenge a proposed termination, and pending resolution of action the Dealer Agreement

> shall remain in full force and effect and [MotoFIT] shall retain all rights and remedies pursuant to the terms and conditions of [the Dealer Agreement], including, but not limited to, the right to sell or transfer [MotoFIT's] ownership interest, until a final determination by the court of competent jurisdiction and any appeal of such determination, unless extended by the court of competent jurisdiction for good cause.

59. As explained in greater detail *supra*, DNA cannot meet its burden to demonstrate good cause and good faith.

60. First, prior to its consummation, MotoFIT informed DNA of the very transaction DNA now seeks to terminate MotoFIT over. If DNA thought this was a terminable offense or at all violated the Dealer Agreement they are a party to, surely DNA should have said something. Arguably, DNA's consent means it waived the ability to protest the alleged breach of the Dealer Agreement.

61. In any event, DNA's actions of suggesting that MotoFIT sell the motorcycle however it could, including advertising it on eBay or "white glove shipping it" are at odds with its Notice. And, DNA sending MotoFIT the Notice alleging that this delivery constituted operating an unauthorized location demonstrates extreme bad faith.

62. Second, DNA's termination appears to allege that MotoFIT failed to ensure that proper pre-delivery inspections, safety checks, and the like as well as the attendant paperwork were not completed on this transaction. This too is simply false. The Ducati dealer in the customer's

area ensured these obligations were performed and MotoFIT ensured it had documentary evidence thereof.[3]

63.  On this point, it is difficult to understand how MotoFIT's actions rise to the level of a breach of *material* and *substantial* obligation under its Dealer Agreement.

64.  Finally, DNA's attempt to terminate MotoFIT for this single offense contradicts DNA's own policies governing violations of its Retail Sales Policy. In fact, the punishments explicitly listed by DNA in its own policy only contemplate a termination after a *4th* violation in a 12-month period. This fact alone makes clear that MotoFIT's actions, even if in violation of their Dealer Agreement, which it disputes, are not a material and substantial breach thereof.

65.  On page 3 of the Retail Sales Policy there is a section entitled "Non-compliance with the Retail Sales Policy." Thereunder, DNA notes that it will monitor compliance and "address issues directly with the subject Dealer as follows."

66.  Thereafter, the Retail Sales Policy lists the punishments for each violation and goes on to note that "each violation shall remain on a Dealer's record for a period of twelve (12) months."

67.  Under DNA's own policy, MotoFIT's first violation should have only resulted in in written notice of the violation and additional monitoring by DNA for 6 months. And even for a third violation in a 12-month period, termination is not contemplated.

---

[3] Ironically, based on Mr. Routhier's definition of "white glove shipping" motorcycles, these steps would be completed by the dealership prior to delivery to the customer and not with the customer's participation, as contemplated in the Retail Sales Policy. So arguably, MotoFIT's method of consummating the transaction adhered more closely to the Retail Sales Policy than DNA's own employee's suggestion.

68.     DNA's substantial and retaliatory deviation from its own policy and punishment guidelines are persuasive evidence of its lack of good faith and good cause to effectuate a termination of MotoFIT's Dealer Agreement.[4]

## COUNT I – UNLAWFUL TERMINATION

69.     Plaintiff re-alleges paragraphs 1 through 68 as if fully set forth herein.

70.     MotoFIT files this protest as authorized by C.G.S. §42-133v and 42-133ee, and seeks a determination that the proposed termination is unfair, lacks good cause, is done in bad faith and is prohibited under Connecticut law.

71.     As explained in greater detail *supra,* DNA is not acting in good faith and does not have good cause in proposing to terminate MotoFIT's franchise in that: (i) DNA was informed ahead of time regarding the transaction it now alleges is a substantial and material violation of the Dealer and said nothing, in fact, it actually suggested MotoFIT should consummate the transaction in essentially the manner it did; (ii) the facts of the allegedly violative sale do not support a violation of the provisions of the Dealer Agreement and Retail Sales Policy that DNA is relying upon; and (iii) DNA's attempted termination for MotoFIT's first violation in this calendar year is in contravention of its policies on punishments for violations of its Retail Sales Policy.

72.     DNA has not acted in good faith and does not have good cause in proposing a termination of MotoFIT's franchise in that DNA has prevented MotoFIT from acquiring a sufficient supply and mix of motorcycles. Moreover, DNA would like to terminate MotoFIT for

---

[4] Undoubtedly, DNA will point to the language following this listing of punishments for specified violations, which notes that DNA "reserves the right to treat repeated violations outside these time periods as additional violations, in its sole discretion." And, the absurdly one-sided provision goes on to state that DNA can also choose to treat "multiple but related violations as single violations or as multiple violations" again in its sole discretion. This likely explains DNA's stacking of remedy provisions in its Notice, as "additional violations," but adds to the evidence of DNA's bad-faith intent in issuing the Notice and lack of good cause therefor.

its low orders of inventory, but instead created this Notice as a pre-text for this otherwise unlawful basis for termination.

73. DNA's proposed termination of MotoFIT's franchise is unfair and prohibited in that the proposed termination relies upon an alleged breach of the Retail Sales Policy that is not a material and substantial breach considering the circumstances, culpability for the alleged breach, and DNA's own stated policies for termination.

74. DNA's proposed termination of MotoFIT's franchise lacks good faith because DNA favors nearby dealers to the detriment of MotoFIT, is retaliating against MotoFIT for not ordering motorcycles at a level it deems appropriate, is acting unfairly with respect to the sale that it has based the termination upon and is seeking to aid the nearby dealers it favors by retaliating against MotoFIT.

## COUNT II – CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)

75. Plaintiff MotoFIT hereby re-alleges the allegations contained in paragraphs 1 through 68, as if fully set forth herein.

76. At all relevant times, DNA was engaged in a trade or business in the State of Connecticut.

77. DNA engaged in retaliatory conduct in attempt to devalue MotoFIT's franchise so it could be purchased at a discount by a competing dealer or removed from competition entirely when DNA sought to terminate it, like the current situation.

78. DNA did so by interfering with the negotiations between MotoFIT and Hudson Valley Motorcycles, forcing MotoFIT to be approved for transfers of motorcycles while it did not do the same to other dealers, arbitrarily denying transfer of motorcycles to MotoFIT, pressuring MotoFIT to place orders for motorcycles it did not want and making it difficult for MotoFIT to

return product it had not ordered, and otherwise treating it unfairly and deceptively, as laid in more detail *supra.*

79. The actions taken by DNA proximately caused MotoFIT to suffer an ascertainable loss of money or property.

80. The actions taken by DNA are unfair and deceptive acts and practices within the meaning of Connecticut General Statutes § 42-110b(a).

81. The actions taken by DNA offend public policy, are immoral, unethical, oppressive, and unscrupulous, and cause substantial injury to dealers such as MotoFIT.

82. Pursuant to the requirements of Connecticut General Statutes § 42-110g(c), MotoFIT will submit a copy of this Complaint to the Connecticut Attorney General as well as the Connecticut Commissioner of Consumer Protection.

## JURY DEMAND

MotoFIT demands a trial by jury on all issues and claims triable to a jury.

## PRAYER FOR RELIEF

WHEREFORE, MotoFIT prays for the following relief:

(a) A determination that DNA's proposed termination violates C.G.S. §42-133v(a) and is invalid;

(b) An order declaring the Dealer Agreement remain in full force and effect until the resolution of this action and any subsequent appeals pursuant to C.G.S. §42-133v(g);

(c) Damages as proven at trial;

(d) An order that DNA pay the attorneys' fees and costs incurred by MotoFIT in bringing this action, pursuant to C.G.S. §42-133ee, § 42-110g, or other law;

(d)  An award of punitive damages; and

(f)  Such further relief as this Court deems just and equitable.

Respectfully Submitted,

PLAINTIFF MOTOFIT, LLC

By: //s// James J. Healy (ct28447)
James J. Healy (ct28447)
Cowdery & Murphy, LLC
280 Trumbull Street, 22nd Floor
Hartford, CT 06103
(860) 278-5555
(860) 249-0012 Fax
E-mail: jhealy@cowderymurphy.com

Jason T. Allen (Application Forthcoming)
W. Kirby Bissell (Application Forthcoming)
BASS SOX MERCER
2822 Remington Green Circle
Tallahassee, FL 32308
Tel. (850) 878-6404
Fax. (850) 942-4869
jallen@dealerlawyer.com
kbissell@dealerlawyer.com

*Attorneys for Plaintiff*